UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DARRELL W. TITUS,

    Plaintiff,

v.

ILLINOIS DEPARTMENT OF
TRANSPORTATION, BOB DUDA, GIOVANNI
FULGENZI, AND DIANE M. O'KEEFE,

    Defendants.

No. 11 C 944

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

Darrell W. Titus, who is African-American, alleges that his employer, the Illinois Department of Transportation ("IDOT"), and IDOT employees Bob Duda, Giovanni Fulgenzi, and Diane M. O'Keefe, discriminated and retaliated against him based on his race in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; and pursuant to 42 U.S.C. § 1983. R. 30. Defendants have moved for summary judgment. R. 81. For the following reasons, Defendants' motion is granted.

**Background**

Since October 1994, Titus has worked as a "Highway Maintainer" for IDOT's Department of Emergency Traffic Patrol ("ETP"). R. 90 ¶ 1. Highway Maintainers, also known as "ETP Drivers," are "first responders" to traffic emergencies on

highways, and are responsible for assisting motorists and removing debris from traffic lanes. *Id.* ¶ 2.

On June 8, 2009, Titus was assigned to patrol a portion of the Eisenhower Expressway. *Id.* ¶ 37. Prior to the end of his shift, Titus received a call from an IDOT dispatcher instructing him to assist a fellow ETP Driver with two vehicles that had broken down on the shoulder of the highway. *Id.* ¶ 38. Titus refused and told the dispatcher that he was going to go home. *Id.* ¶ 39. This prompted Titus's supervisor, Lloyd Colbert, to get on the radio and tell him, "[N]o, Titus. You go over there and help." *Id.* ¶ 40. Titus responded, "No, I'm going home. My shift is over." *Id.* ¶ 41. Titus then drove to the IDOT garage to retrieve his personal vehicle. *Id.* When Titus arrived at the garage, he and Colbert began to argue. *Id.* ¶ 42. Colbert maintains that Titus "yelled and cursed at him." *Id.* Titus denies this allegation and asserts that he was only speaking "aggressively." *Id.* In any event, Titus does not dispute that he refused to follow Colbert's order to provide assistance to the other ETP Driver. *Id.* ¶¶ 39-42.[1]

Following the incident, Colbert prepared a statement detailing Titus's refusal to obey his order and a separate statement describing their altercation in the

---

[1] Titus's complaint also made claims based on statements Duda made on November 23, 2009. *See* R. 30 ¶ 5. The Court previously dismissed Titus's "Title VII discrimination claims to the extent they are based on Duda's statement to [Titus] on November 23, 2009." *See Titus v. Ill. Dep't of Transp.*, 828 F. Supp. 2d 957, 969 (N.D. Ill. 2011). Nevertheless, the parties make reference to these statements in their recitations of the facts on this motion, *see* R. 90 ¶ 56; R. 92 at 3; although neither side makes any argument based on these facts. The Court has already dismissed Titus's claims based on the November 23, 2009 statements, and the Court will not address these statements on this motion since the parties make no additional arguments based on these statements.

garage. *Id.* ¶ 43. In accordance with IDOT procedures, ETP Manager Bob Duda conducted an investigation and collected statements from five other employees who had personal knowledge of the incident. *Id.* ¶¶ 20, 44-45. One employee wrote that "[t]his is getting old . . . we need help in this matter." *Id.* ¶ 45. Other employees commented in their statements that they heard Titus swearing over the IDOT radio frequency. *Id.* ¶ 45. Another employee email described Titus as a "bad actor." R. 93-42.

Duda submitted the results of his investigation to Operations Manager Anthony Dilacova, who determined that a Notice of Rule Infraction[2] should be issued. *Id.* ¶¶ 21-22, 48. The Notice of Rule Infraction and witness statements were then forwarded to the Personnel Services Manager for IDOT's District One, defendant Giovanni Fulgenzi, who made the final determination that Titus had violated employee policy by "refus[ing] to comply with direct orders of a supervisor." *Id.* ¶¶ 49-50. Defendant Diane O'Keefe was the Regional Manager (the highest ranking position) for IDOT's District One during this time period. R. 90 ¶ 3. Discipline notices sent to employees are signed on Diane O'Keefe's authority. R. 83-3 ¶ 46.

Titus received a 15-day suspension for "insubordination, disruptive conduct, and poor work performance." *Id.* ¶ 53. Titus began serving his suspension on August 16, 2009. *Id.* He remains an IDOT employee. *Id.*

---

[2] A Notice of Rule Infraction describes the incident at issue and lists the IDOT rules that the employee allegedly violated. R. 90 ¶ 21. It does not constitute a finding that the employee committed a violation or that discipline is warranted. *Id.* ¶¶ 21, 26.

3

Titus did not file a grievance with IDOT challenging the suspension. *Id.* ¶ 54. He did, however, file an EEOC charge on February 22, 2010. R. 90 ¶ 6. Titus had also previously filed EEOC charges in 2004, 2005 and 2006. R. 90 ¶ 6. The EEOC issued Titus a "right to sue notice" on November 18, 2010. R. 83-1 at 2.

In August 2004, almost five years prior to the incident at issue in this case, an IDOT staff member not named as a defendant in this case told Titus "that if his comments about discrimination [did] not cease, that further discipline [would] be administrated." R. 93-44. The IDOT staff member made this comment to Titus after Titus had informally accused his IDOT managers of changing his shift because of his race. *See id.* The record does not reflect whether this incident was the basis for Titus's 2004 EEOC complaint.

Prior to the events of this lawsuit, Titus had been disciplined seven times, but only one other time since 2007. R. 83-9 at 1. Of the eight disciplinary actions, five were for "insubordination," like the suspension at issue here, and four involved a "failure to follow [his] supervisor's orders," which was also provided as a justification for Titus's suspension in this case. R. 83-9 at 1; R. 90 ¶ 17. Four of the prior seven disciplinary actions resulted in suspensions, beginning with a suspension of one day, followed by suspensions of three, five and ten days. R. 90 ¶ 17.

Titus cites three other white IDOT employees he alleges committed similar violations but who he alleges were disciplined more leniently. Williams Macklin is an ETP Driver like Titus. R. 90 ¶ 73. Since 2007, Macklin has been disciplined six

4

times, including twice for insubordination, but never for a failure to follow orders. *See* R. 93-21. Macklin has been suspended three times, including suspensions of one day, 15 days (reduced to five after a grievance process), and five days (expunged after a grievance process). *See id.*

James Barch is not an ETP Driver in the Bureau of Traffic Operations, but a highway maintainer in the Bureau of Maintenance Operations. Nevertheless, like Titus, he is employed by IDOT's District 1, and as such, any discipline he receives is reviewed by Fulgenzi and O'Keefe. *See* R. 90 ¶¶ 3, 35, 49-50. Since 2003, Barch has been disciplined four times, including twice for insubordination, but never for a failure to follow orders. Barch has been suspended once for one day. *See* R. 93-20.

Anthony Altmeyer also is not an ETP Driver, but is a highway maintainer in District 1. *See* R. 102 ¶ 35; R. 93-21. Since 2007, Altmeyer has been disciplined six times, including once for insubordination, but never for a failure to follow orders. *See* R. 93-21. Altmeter has been suspended four times, including suspensions of five days, ten days (reduced to one after a grievance process), ten days again (reduced to five after a grievance process), and an indefinite suspension that was reduced to ten days after a grievance process. *See id.*

IDOT's 2008 Affirmative Action Plan noted that "[f]or 16 consecutive years, 1991-2007, [IDOT] has identified the negative impact caused by the suspension rate of minority male maintenance workers." R. 93-6 at 5. IDOT's Affirmative Action Plans from 2007 through 2012 have identified as a "problem area" for IDOT the "disparate treatment" of minority highway maintenance employees, "particularly

5

African-Americans" who have been "more likely to be disciplined than white maintenance employees." R. 93-4 at 53 (2007); R. 93-6 at 104 (2008); R. 93-7 at 91 (2010); R. 93-10 at 66 (2011); R. 93-13 at 22 (2012). A 2008 report about IDOT by the Illinois Department of Human Rights noted that "African Americans who make up 8% of the agency received 27% of the suspensions." R. 93-15 at 5.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

**I.  Retaliation Claim**

As an initial matter, Titus did not respond to Defendants' arguments against Titus's retaliation claims, and Defendants ask the Court to dismiss Counts II and

IV on that basis. R. 100 at 3-4. The Seventh Circuit has "long refused to consider arguments that were not presented to the district court in response to summary judgment motions." *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999); *Smart Options, LLC v. Jump Rope, Inc.*, 2012 WL 5499434, at *5 (N.D. Ill. Nov. 13, 2012) ("'The law is clear in the Seventh Circuit that a party waives arguments not presented to the district court in response to summary judgment.'" (quoting *LG Elecs. v. Whirlpool Corp.*, 2009 WL 5579006, at *3 (N.D. Ill. Nov. 23, 2009)). Thus, Titus has waived his retaliation claims because he did not respond to Defendants' arguments that they should be dismissed, and the Court grants Defendants' motion for summary judgment on Counts II and IV.

## II. Title VII Claim

Title VII of the 1964 Civil Rights Act makes it unlawful for an employer to discriminate against an employee on account of his "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The "central question at issue is whether the employer acted [adversely against the plaintiff] on account of the plaintiff's race." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). A plaintiff can answer this question according to either of two "methods" of proof. The "direct method" is nothing more than relying on any evidence—whether direct or circumstantial—that "link[s] an adverse employment action to an employer's discriminatory animus." *Id.* at 995. The indirect method is "a particular way of using circumstantial evidence at the summary judgment stage," *id.* at 996, that requires the plaintiff to establish a *prima facie* case of discrimination, and then

7

show that any non-discriminatory reasons for the adverse employment action "were dishonest or phony," or pretextual. *See Benuzzi v. Bd. of Educ. of City of Chicago*, 647 F.3d 652, 663 (7th Cir. 2011); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 807 (1973). Whether evaluated according to the direct or indirect method, circumstantial evidence that requires "guesswork and speculation [is] not enough to avoid summary judgment." *Good v. Univ. of Chi. Med. Center*, 673 F.3d 670, 675 (7th Cir. 2012).

### A. Direct Method

Titus contends that the following evidence creates a material question of fact regarding whether Defendants suspended him for 15 days on account of his race: (1) an email sent in the course of determining his discipline that described him as a "bad actor," R. 93-42; (2) an incident from August 2004 during which he was warned not to make discrimination claims, R. 93-44; (3) similarly situated employees who were not as severely disciplined; and (4) the IDOT reports stating that "white employees received systematically better treatment with regards to discipline," R. 92 at 10.

#### 1. Emails

As an initial matter, the email dated July 30, 2009 in which an IDOT staff member described Titus as a "bad actor" is not evidence of discrimination. This email does not mention Titus's race, and Titus makes no argument as to how this email shows that his race was a factor in determining his discipline.

The email memorializing an incident from August 2004 during which Titus was warned not to file discrimination claims is more troubling. The statement, however, is attributed to an IDOT employee who Titus does not allege to be involved in the events at issue in this case. Moreover, the statement occurred five years prior to the events at issue here. While this email might be evidence to support a retaliation claim in the time period immediately following that incident, Titus has not alleged such a claim. Absent speculation in which the Court is not permitted to engage, *see Good*, 673 F.3d at 675, the Court cannot conclude that a reasonable jury would find that this email from 2004 is evidence that Defendants suspended Titus on account of his race in 2009.

### 2. Other Employees

Titus also argues that white employees—Macklin, Barch, and Altmeyer—who committed similar IDOT rule violations were disciplined more leniently. R. 92 at 12-16. Defendants argue that Barch and Altmeyer are not proper comparators because they work in a different bureau from Titus and their disciplinary records are not as significant. R. 100 at 10-11. Defendants also argue that Macklin is not a proper comparator because one of his suspensions was administrated by IDOT's Bureau of Civil Rights, and several of his suspensions were reduced in the grievance process. *Id*. at 8-9.

Although a "similarly situated employee must be directly comparable to plaintiffs in all material respects. . . . [t]his is a common-sense analysis, not an inflexible requirement that requires near one-to-one mapping between employees."

9

*Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 981 (7th Cir. 2014) (citations and internal quotation marks omitted). Here, like Titus, Macklin, Barch, and Altmeyer are all employees within IDOT's District 1. This means that the people who occupied the positions Fulgenzi and O'Keefe occupied during the relevant time period for Titus were ultimately responsible for Macklin, Barch, Altmeyer, and Titus's discipline. Titus, Macklin, Barch, and Altmeyer are also all "highway maintainers," whether or not they are specifically "ETP Drivers." For these reasons, the Court finds that Macklin, Barch, and Altmeyer are situated similarly to Titus.

Yet, the record does not suggest that Macklin, Barch, and Altmeyer were treated more favorably than Titus. All three were suspended, with Macklin and Altmeyer suspended on multiple occasions just as Titus was. Futhermore, like Titus, Macklin and Altmeyer were both given suspensions of ten days or greater, with Macklin once receiving a suspension of 15 days just like Titus. That some of these suspensions were reduced through the grievance process is irrelevant as Titus did not attempt to reduce his suspension through the grievance process.

Titus's argument that he was treated less favorably then Macklin, Barch, and Altmeyer is entirely focused on the discipline records IDOT produced which seem to undercount the offenses these employees committed. *See* R. 92 at 12-16. Defendants state, without reference to the record, that the offenses were not undercounted but that, pursuant to IDOT policy, these employees were officially credited with fewer offenses as a reward for passing a certain amount of time without committing an additional offense. *See, e.g.*, R. 102 ¶ 22. Without further detail regarding IDOT's

policies, the Court cannot credit this explanation. But in any event, Titus's concern is irrelevant because he was a beneficiary of the same "creative accounting," as Titus describes it. R. 92 at 12. IDOT's records describe the offense at issue in this case as Titus's "4th Offense," R. 93-21 at 25, despite the fact this was actually Titus's eighth offense. R. 83-9 at 1. Ultimately, the Court's review of the offenses for those similarly situated to Titus was based on the actual number of offenses and the discipline imposed, no matter how IDOT actually counted them.

Titus might have argued (although he did not) that he committed his offenses over a much longer period of time than Macklin and Altmeyer, and that his discipline should not have reached as great a level as theirs since he is not as frequent an offender. Titus, however, had a consistent history of committing the specific offenses of insubordination and failing to follow his supervisors' orders. These are serious offenses, and Macklin and Altmeyer do not have a consistent history of committing such offenses. Thus, despite Titus's less frequent pattern of disciplinary violations, a reasonable jury could not conclude that he was treated less favorably than Macklin and Altmeyer.

### 3. Statistics

Titus also cites IDOT's Affirmative Action Plans and the Illinois Department of Human Resources' quarterly statistical reports to show that "white employees received systematically better treatment with regards to discipline," and argues that the statistics and IDOT admissions in these reports are sufficient to establish that IDOT discriminated against him. R. 92 at 10. IDOT admits in these reports

11

that, in general, IDOT continues to exhibit "disparate treatment" of African-Americans in that they are disciplined at a greater rate than white employees.

Statistics showing "that similarly situated employees outside of the protected group systematically receive better treatment" can be evidence of discrimination. *Morgan*, 724 F.3d at 995. But statistics "standing virtually alone . . . cannot establish a case of individual disparate treatment." *Plair v. E.J. Brach & Sons, Inc.*, 105 F.3d 343, 349 (7th Cir. 1997) (internal citations and quotations omitted).

Here, Titus has no evidence that IDOT took his race into account in suspending him. The statistics and admissions in IDOT's reports could potentially serve to support a case of discrimination against an individual where there was other evidence that the individual had been treated unfairly because of the individual's race. But the general percentages and admissions in IDOT's reports are not evidence of the reasons Titus in particular was suspended for 15 days. Standing alone—as they are here because the Court's discussion to this point shows that Titus has not produced any other evidence of discrimination—the information in these reports is an insufficient basis for a reasonable jury to conclude that IDOT discriminated against Titus.

### B. Indirect Method

Titus also cannot defeat summary judgment using the indirect method. The indirect method requires that Titus show that IDOT afforded more favorable treatment to similarly situated employees. *See Benuzzi*, 647 F.3d at 662; *see also*

*McDonnell Douglas*, 411 U.S. at 807. The Court has already explained that Titus has failed to make such a showing in its discussion of the direct method.[3]

Even if Titus could establish a *prima facie* case of discrimination, no genuine question of material fact exists regarding the motivation for Titus's 15-day suspension. Defendants, of course, contend that Titus was suspended for 15 days because of his "refusal to follow a supervisor's order." R. 82 at 11. Titus does not directly challenge this contention in the context of making his argument under the indirect method, and thus, he has waived his opportunity to show that IDOT's explanation is pretextual. In any event, there is no evidence in the record that could reasonably support a finding that IDOT suspended Titus for 15 days on account of his race. It is undisputed that Titus disobeyed a supervisor's order, and that he had a history of such conduct. He has received suspensions for such conduct in the past, and the length of the suspensions has increased with each incident. Nothing about these facts suggests that IDOT suspended Titus for 15 days because he is African-American.

## III. Section 1983 Claims

The Seventh Circuit has made clear that the standards for proving discrimination and retaliation under Title VII apply equally to Section 1983 claims.

---

[3] Defendants also argue that Titus has failed to show that he was meeting IDOT's reasonable expectations—another element of the indirect method—since Titus admits that he committed a punishable offense. R. 82 at 4-6. But Titus's claim is not that he did nothing to merit discipline, but that his discipline was harsher than suspensions given to white employees. "[I]t makes little sense in this context to determine whether [Titus] was meeting [IDOT's] legitimate expectations." *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (internal quotation marks omitted).

*See Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003). "[Section] 1983 claims against individual defendants can be dismissed on the same basis as Title VII claims." *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003). Therefore, because the Court has held that a reasonable jury could not find that Defendants violated Title VII, the Court also holds that a reasonable jury could not find that Defendants violated Titus's constitutional rights.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment, R. 81, is granted, and Titus's claims are dismissed.

ENTERED:

*Thomas M. Durkin*

Thomas M. Durkin
United States District Judge

Dated: February 18, 2014